CITY OF MILWAUKEE, Plaintiff-Respondent,

v.

K.F., Defendant-Appellant. [Case No. 87–0936.]

CITY OF MILWAUKEE, Plaintiff Respondent,

v.

D.A., Defendant-Appellant. [Case No. 87–0937.]

Supreme Court

*Nos. 87–0936, 87–0937. Argued May 31, 1988.—Decided July 20, 1988.*

(Also reported in 426 N.W.2d 329.)

24

25

26

For the defendant-appellants there were briefs by *Robert M. Courtney* and *Courtney, Pledl & Molter, S.C.,* Madison, and oral argument by *Robert M. Courtney.*

For the plaintiff-respondent there was oral argument by *Scott G. Thomas,* assistant city attorney, with whom on the brief was *Grant F. Langley,* city attorney.

LOUIS J. CECI, J. This case is before the court on petition to bypass the court of appeals, pursuant to sec. 808.05, Stats. The issue presented concerns the constitutionality of Milwaukee's curfew ordinance, Milwaukee Code of Ordinances, sec. 106–23. We find the ordinance constitutional and, therefore, affirm the order of the trial court.

This case arose from citations issued by the Milwaukee Police Department on January 4, 1986, to approximately 95 youths who were attending a dance sponsored by the University of Wisconsin Black Student Union for the purpose of promoting higher education. The dance was held at the War Memorial Center in Milwaukee. In addition to approximately 400 youths, several adults were present at the dance, including those overseeing the event and operating equipment, security personnel, and police officers.

One of the Milwaukee police officers who was involved in the enforcement of the ordinance at the dance was a member of the gang squad and testified that he had learned that a gang confrontation which had occurred in another part of the city on January 4, 1986, involving the display of weapons, was to be continued at the War Memorial Center that evening.

The officer informed the individual in charge of security at the War Memorial Center that there was a possibility of gang activity and advised security personnel to be alert to certain indications of gang activity.

The police returned to the War Memorial Center at about 10:00 p.m. after receiving several complaints of vehicle thefts in the area which, according to the police officer, suggested the presence of gangs. At that time, the officer advised one of the individuals in charge of the dance of the curfew ordinance and requested that an announcement be made that youths under age 17 leave the premises by the 11:00 p.m. curfew time. The parties stipulated that the announcement was made pursuant to this instruction. The officers then departed, but returned shortly after 11:00 p.m., at which time they were summoned by a security guard due to an incident involving the vandalization of vending machines at the War Memorial Center. In the course of investigating this incident, the police discovered graffiti associated with certain gangs.

Subsequently, the police officers entered the dance hall and observed about 400 people in attendance, 70 of whom were estimated to be under the age of 17, including some youths believed to be 11 or 12 years old. The officer advised a supervisor of the dance that because there appeared to be individuals under the age of 17, unaccompanied by a parent or adult, in attendance at the dance after the 11:00 p.m. Milwaukee curfew time, the dance was to be shut down.

When the dance was terminated, individuals who appeared to be under the age of 17 were stopped and questioned. Those who were under the age of 17 were arrested and taken to the police administration build-

ing. The police officer testified that youths whose parents had arrived to pick them up at the War Memorial Center were permitted to leave without the issuance of citations and further stated that any juveniles who had wished to call their parents were afforded the opportunity to do so. However, the appellants testified that they were not permitted to call their parents at the time the dance was terminated.[1]

The appellants, K.F. and D.A., were at the dance and were issued citations for violation of the Milwaukee curfew ordinance. K.F. was 15 years old, and D.A. was 16 years old at that time. The appellants pleaded not guilty and requested a jury trial. Appellants filed motions to dismiss the charges, challenging the constitutionality of the curfew ordinance on the basis that it was unconstitutionally vague and overbroad. The trial court issued a decision on November 25, 1986, denying the motion to dismiss and finding the ordinance constitutional. The appellants waived their right to a jury trial, and a trial before the court was held. The trial judge rendered a decision, finding the appellants guilty of violating the curfew ordinance. Suspended sentences were ordered for both appellants. A written order finding K.F. and D.A. guilty of violation of the

---

[1]There would appear to have been some confusion as to whether the appellants had been prevented from leaving the dance just before the 11:00 p.m. curfew time. However, at trial, the appellants entered into a stipulation regarding testimony that the Milwaukee police officers did not return to the War Memorial Center until approximately 11:15 p.m. Thus, it would appear that if appellants were stopped prior to 11:00, it was by security persons associated with the student association who were trying to retain order during a commotion in the area concerning the vending machine vandalism.

curfew ordinance was entered on April 10, 1987.[2] Appellants appealed from this order, which we now affirm.

■

The text of the challenged Milwaukee ordinance is as follows:

"*Loitering of Minors (Curfew Hours).* It shall be unlawful for any person under the age of seventeen (17) years to congregate, loiter, wander, stroll, stand or play in or upon the public streets, highways, roads, alleys, parks, public buildings, places of amusement and entertainment, vacant lots or any public places in the city of Milwaukee, either on foot or in or upon any conveyance being driven or parked thereon, between the hours of 11 p.m. and 5 a.m. of the following day, official city time, unless accompanied by his or her parent, guardian or other adult person having his or her care, custody or control." Milwaukee Code of Ordinances, § 106–23.[3]

---

[2]The dissent characterizes the ordinance violation as "quasi-criminal." Dissenting op. at 58–59, n. 5. Such a characterization is an archaic and inaccurate description of a municipal ordinance charge, which is a civil action for money forfeiture.

[3]Milwaukee Code of Ordinances sec. 106–23 additionally provides, in pertinent part, as follows:

"(1) *Responsibility of Parents.* It shall be unlawful for the parent, guardian or other adult person having the care and custody of a person under the age of seventeen (17) years to suffer or permit or by inefficient control to allow such person to congregate, loiter, wander, stroll, stand or play in or upon the public streets, highways, roads, alleys, parks, public buildings, places of amusement and entertainment, vacant lots or any public places in the city of Milwaukee between the hours of 11 p.m. and 5 a.m. of the following day, official city time, unless the said person under the age of 17 years is accompanied by his or her parent,

The appellants challenge the Milwaukee ordinance on separate but related grounds: unconstitutional vagueness and overbreadth, contrary to the first and fourteenth amendments of the United States Constitution and corresponding provisions of the Wisconsin Constitution. *See* Wis. Const. art. I, secs. 1, 3, 4, and 18. Both vagueness and overbreadth challenges constitute assertions that the ordinance is unconstitutionally imprecise. However, whereas a vagueness challenge draws its essence from procedural due process, constitutional overbreadth concerns the distinct principle of substantive due process. *See Bachowski v. Salamone,* 139 Wis. 2d 397, 406, 411, 407 N.W.2d 533 (1987).

We first address the appellants' vagueness challenge. The concept of vagueness may be generically described as resting on the "constitutional principle that procedural due process requires fair notice and proper standards for adjudication." *State ex rel. Hennekens v. City of River Falls Police & Fire Commission,* 124 Wis. 2d 413, 420, 369 N.W.2d 670, *reconsideration*

---

guardian or other adult person having his or her care, custody or control; provided that any parent, guardian or other adult person herein who shall have made a missing person notification to the police department shall not be considered to have suffered or permitted any person to be in violation of this section.

". . .

"(4) *Penalty; minor.* Any person under the age of seventeen (17) years violating the provisions of Section 106–23 shall be referred to the proper authorities as provided in Chapter 48 of the Wisconsin Statutes.

"(5) *Penalty; parents, etc.* Any person, firm or corporation violating any of the provisions of this section, upon conviction thereof, shall be fined not less than ten dollars ($10) nor more than two hundred dollars ($200), and in default of payment thereof be confined in the county jail not more than sixty (60) days."

*denied* 126 Wis. 2d 39, 373 N.W.2d 672 (1985). The constitutional demand of procedural due process is not a requirement that the statute or ordinance be drafted with mathematical exactitude. As stated by the United States Supreme Court in *Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972): "Condemned to the use of words, we can never expect mathematical certainty from our language." Accordingly, the standard applied to examine a statute or ordinance has been expressed as follows: "A fair degree of definiteness is all that is required to uphold a statute or regulation, and a statute or regulation will not be voided merely by showing that the boundaries of the area of proscribed conduct are somewhat hazy." *Hennekens,* 124 Wis. 2d at 420 (citing *State v. Courtney,* 74 Wis. 2d 705, 710–11, 247 N.W.2d 714 (1976)). *See also State v. McCoy,* 143 Wis. 2d 274, 286, 421 N.W.2d 107 (1988). We have further explained:

> "'... Before a ... rule may be invalidated for vagueness, there must appear some ambiguity or uncertainty in the gross outlines of the duty imposed or conduct prohibited such that one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the ... rule.'" *Hennekens,* 124 Wis. 2d at 420–21 (quoting *Courtney,* 74 Wis. 2d at 711).

■ Prior to embarking upon an analysis of the ordinance upon vagueness grounds, this court must first determine whether the appellants' conduct is clearly proscribed by the ordinance because "a plaintiff whose conduct is clearly proscribed by the statute

in question cannot complain of the vagueness of a law as applied to others; the law must be impermissibly vague in all of its applications." *State ex rel. Smith v. Oak Creek,* 139 Wis. 2d 788, 802–03, 407 N.W.2d 901 (1987).[4] Rules of standing have been liberalized with respect to overbreadth challenges such that even where the challenger's conduct might constitutionally be regulated, the challenger "may hypothesize situations where the statute is so broad that it would chill legitimate activities and apply to fact situations where the regulation sought to be imposed would violate fundamental first-amendment rights." *State v. Tronca,* 84 Wis. 2d 68, 89, 267 N.W.2d 216 (1978). In *Oak Creek,* first amendment challenges were not implicated, so the court did not resolve the issue of whether standing should be similarly liberalized with respect to vagueness claims. *Oak Creek,* 139 Wis. 2d at 802. We now determine that even where first amendment rights are implicated, a challenger whose conduct was clearly prohibited by the terms of a statute or ordinance does not have standing to challenge the vagueness of a statute or ordinance as hypothetically applied to the conduct of others; there is absolutely no nexus between the status of an individual whose conduct is clearly prohibited by a regulation and a constitutional challenge asserting an absence of fair notice. *See Parker v. Levy,* 417 U.S. 733, 756 (1974). *See also Tronca,* 84 Wis. 2d at 89; L. Tribe, American Constitutional Law, § 12–32, at 1036 (2d ed. 1988).[5] *See*

[4]The dissent would appear to view both the decisions of this court and those of the United States Supreme Court regarding standing limitations to be doctrines to be applied or rejected on an *ad hoc* basis. Judicial activism may not be accomplished by piercing well-settled doctrines of standing.

[5]Professor Tribe has succinctly explained the question of standing to assert vagueness challenges involving allegations of impingement upon first amendment rights as follows:

*also Moedern v. McGinnis,* 70 Wis. 2d 1056, 1064, 236 N.W.2d 240 (1975) (standing requisite of logical nexus). Accordingly, our analysis of the challenge to the vagueness of the ordinance must necessarily commence with consideration of whether the ordinance, as applied to the appellants, clearly proscribed their conduct.

At the time the ordinance citations were issued, the youths were under 17 years old and were attending a dance with at least 90 other juveniles at the War Memorial Center in Milwaukee. Whatever possible ambiguities might be hypothetically constructed as to the application of the term "congregate" as used in the ordinance, a function in which such a large number of youths is assembled unequivocally constitutes a "congregation."

It is equally certain that the War Memorial Center falls within the definition of a "public building" within the terms of the ordinance. As explained by the executive director of the War Memorial Center by testimony during trial, the War Memorial Center is "a public building" by "any definition." The public nature of the War Memorial Center is made abundantly apparent both by the terms of the agreement between the Milwaukee County War Memorial Center, Inc. and the County of Milwaukee executed for the

---

"While this rationale of 'chilling effect' thus justifies relaxation of the rule against third-party claims, some nexus is nevertheless required, even in first amendment cases, between the vice of the statute and the conduct of the litigant. Where the vice is vagueness, the litigant asserting the vagueness defense must demonstrate that the statute in question is vague either in all possible applications or at least as applied to the litigant's conduct, and not simply as applied to some others." L. Tribe, *supra,* § 12–32 at 1036.

construction of the Center and by the operational policies adopted by the War Memorial Center.[6] The building was constructed and is operated for the public for use by veterans' organizations and for community activities. To the extent that the building is by description "public," it far exceeds in terms of public use the standards set forth by sec. 101.01(2)(g), Stats., defining public buildings. Section 101.01(2)(g) provides as follows:

> "'Public building' means any structure, including exterior parts of such building, such as a porch, exterior platform or steps providing means of

[6]For example, the resolutions in the agreement provided *inter alia:*

"4. The buildings located in Juneau Park shall be constructed and operated for the public welfare, education and use of the citizens of Milwaukee County, subject only to such reasonable rules and regulations as the County Board may from time to time prescribe.

"5. The said Memorial buildings shall be dedicated to and used for public purposes, and the management thereof shall be in Milwaukee County or such appropriate body and to the extent thereof as may be designated by the County, and as provided in Section 45.058 W.S. as from time to time amended; and said buildings or improvements shall be managed under such regulations and conditions as provided in Section 45.055 W.S. as from time to time amended, so that the facilities shall be available to the residents of Milwaukee County subject to such reasonable rules and regulations as the County Board of Supervisors may prescribe from time to time.

" . . .

"11. The legal title to all War Memorial buildings and other facilities constructed to be used in connection therewith shall be vested in Milwaukee County.

"12. It is further agreed that the War Memorial buildings and facilities shall not be used for any purpose other than a purpose recognized under the laws of the State of Wisconsin as a public purpose."

ingress or egress, used in whole or in part as a place of resort, assemblage, lodging, trade, traffic, occupancy, or use by the public or by 3 or more tenants. When used in relation to building codes, 'public building' does not include a previously constructed building used as a community-based residential facility as defined in s. 50.01(1) which serves 20 or fewer unrelated residents."

The War Memorial Center is used "in part," if not exclusively, for "assemblage" by the public. Thus, it must be beyond dispute that the War Memorial Center is a public building by statutory definition and, in fact, would be within any definition which could reasonably be ascribed to that term.[7]

Finally, while some adults were present at the dance, their presence could not by any interpretation or contortion of the language of the ordinance be deemed to constitute "accompan[iment] by [a] parent, guardian or other adult person having ... care, custody or control" of the juveniles. Because the term

---

[7]The dissent's thorough discourse regarding the term "public," while interesting, is unimpressive with respect to the interpretation of the Milwaukee ordinance. The ordinance does not necessitate a query as to whether the dance was "public," but only as to whether it was held in a "public building." Furthermore, even if the relevant question were whether the function, as opposed to the building, was public, there is ample evidence in the record that the dance was public, including the fact that the dance was promoted over the radio for attendance by the general public and that admission was apparently granted to all those who appeared at the War Memorial Center to attend the dance who paid a $3.00 admission fee. Accordingly, while it is true that the War Memorial Center policy was not to permit public dances, the executive director of the Center testified that, contrary to his expectations, the dance, as carried on, was unequivocally public.

"accompany" is nontechnical, we refer, as we would where interpreting a statute, to a recognized dictionary to ascertain the common and approved usage of the term. *McCoy,* 143 Wis. 2d at 287. This language unambiguously refers to individualized supervision: the common meaning of the term "accompany" is defined in Webster's Third New International Dictionary 12 (1961) as "to go with or attend as an associate or companion."[8] While it is undisputed that some adults were present at the War Memorial Center dance, even if it were presumed that the adults present at the dance had "care, custody or control" of the attending youths, such individualized supervision as contemplated by the reference in the ordinance to accompaniment was absent from the event. Accordingly, because it is uncontroverted that the youths were within the regulated age and involved in conduct in a place unambiguously proscribed by the ordinance, the ordinance was not vague in its application as to the appellants, but rather perfectly precise in its

---

[8]The dissent's compilation of alternative dictionary definitions does not detract from the fact that "accompany," as applied in the ordinance, connotes individualized supervision. Certainly, to the extent that the term "accompany," as posited by the dissent, suggests one going along with or escorting another, the term describes being in another's company in an individual sense. In this regard, we note that we have not purported to suggest that the term is limited to a "one-to-one relationship." Dissenting op. at 57. Rather, we have merely explained that which appears rather obvious—"accompany" connotes something more personal or individualized than is present where a few adults are present to chaperone a large dance. Because the appellants were thus clearly not accompanied such as to be excepted from coverage of the ordinance, they have no standing to hypothetically challenge the purported vagueness of the term.

application to the activities of these youths.[9] We thus find that the appellants do not have standing to challenge the ordinance as unconstitutionally vague.

Our resolution of appellants' vagueness challenge is not dispositive of the question of overbreadth. A statute or ordinance may be entirely clear yet, in its unambiguous application, unjustifiably intrude upon constitutionally protected rights. We have explained the concept of overbreadth as follows:

> "A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate. *Wilson,* 96 Wis. 2d at 19. The essential vice of an overbroad law is that by sweeping protected activity within its reach it deters citizens from

---

[9]The dissent suggests that the fact that the police did not issue citations to juveniles whose parents were at the War Memorial center is illustrative of the opportunity for arbitrary judgment under the ordinance. Dissenting op. at 55–56. First, we note that it is not at all clear whether the parents were at the scene' before or after the 11:00 p.m. curfew. Because of the commotion attending the vending machine vandalism, the parents may have been unable to retrieve their children prior to the 11:00 p.m. curfew time. However, whether the parents were at the War Memorial Center before or after the curfew time, and whether the police erred or acted properly in failing to issue citations to these juveniles, is not the question in the present case. The issue before the court, as noted at one point in the dissent, is whether the ordinance is "so obscure that [individuals] of ordinary intelligence must necessarily guess as to its meaning and differ as to its applicability." *City of Milwaukee v. Wilson,* 96 Wis. 2d 11, 16, 291 N.W.2d 452 (1980). Dissenting op. at 53. The dissent, in effect, creates and addresses an equal protection claim asserting discriminatory enforcement. Significantly, equal protection is not the constitutional challenge before the court.

exercising their protected constitutional freedoms, the so-called 'chilling effect.'" *Bachowski,* 139 Wis. 2d at 411.

As distinct from the doctrine of unconstitutional vagueness which draws its essence from procedural due process, overbreadth concerns substantive due process and is directed to "preventing the limiting, by indirection, of constitutional rights." *Tronca,* 84 Wis. 2d at 89.

As explained above, contrary to the analysis under a vagueness challenge, with respect to over-breadth a plaintiff may have standing to challenge the constitutionality of a statute or ordinance even where his or her own conduct could constitutionally be regulated under a narrowly drawn law. *State v. Princess Cinema of Milwaukee, Inc.,* 96 Wis. 2d 646, 656, 292 N.W.2d 807 (1980); *City of Milwaukee v. Wilson,* 96 Wis. 2d 11, 19, 291 N.W.2d 452 (1980). Accordingly, in asserting an overbreadth challenge an individual may hypothesize situations in which a statute or ordinance would unconstitutionally intrude upon the first amendment rights of third parties. *Tronca,* 84 Wis. 2d at 89. However, in analyzing the constitutionality of potential applications of a regulation, the court will not deem a statute or ordinance invalid because in some conceivable, but limited, circumstances the regulation might be improperly applied. In this regard, the decision of the United States Supreme Court in *Houston v. Hill,* 107 S. Ct. 2502, 2508 (1987), is instructive:

"The elements of First Amendment over-breadth analysis are familiar. Only a statute that is substantially overbroad may be invalidated on

40

its face. *New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982); *Broadrick v. Oklahoma, supra.* 'We have never held that a statute should be held invalid on its face merely because it is possible to conceive a single impermissible application. ...' *Id.,* at 630, 98 S.Ct., at 2925 (BRENNAN, J., dissenting). Instead, '[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.' *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 465 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982); *Kolender v. Lawson,* 461 U.S. 352, 359, n. 8, 103 S.Ct. 1855, 1859, n. 8, 75 L.Ed.2d 903 (1983)."

*See also Boos v. Barry,* 108 S. Ct. 1157, 1168 (1988).

In support of the argument that the curfew ordinance is unconstitutionally broad, the appellants delineate several rights upon which the ordinance purportedly impinges. Specifically, appellants assert that the following rights are fundamental and are unconstitutionally intruded upon by the breadth of the curfew ordinance: freedom of movement and travel; freedom of association, assembly, speech, expression, and religion; and, finally, family autonomy.

■

It is apparent from the face of the curfew ordinance that the ordinance directly restricts the movement and associational rights of juveniles during the proscribed period of six hours and may indirectly or incidentally affect rights of expression and religion. This court has previously discussed the inherent right of freedom of movement:

> "The freedom to move about is a basic right of citizens under our form of government, in fact,

under any system of ordered liberty worth the name. It was not added to our United States Constitution by the enactment of the first ten amendments. It is inherent, not only in the Bill of Rights, but in the original document itself. It has properly been termed 'engrained in our history' and 'a part of our heritage.'" *Ervin v. State,* 41 Wis. 2d 194, 200–01, 163 N.W.2d 207 (1968) (footnote omitted).

*Cf. Town of Vanden Broek v. Reitz,* 53 Wis. 2d 87, 191 N.W.2d 913 (1971), *appeal dismissed* 406 U.S. 902 (1972). This right to be free to move about within one's own state is inherent and distinct from the right to interstate travel protected by the commerce clause. *See Shapiro v. Thompson,* 394 U.S. 618, 629–30 (1969) (quoting *Passenger Cases,* 48 U.S. (7 How.) 283, 492 (1849)). *See also Papachristou v. City of Jacksonville,* 405 U.S. 156, 164 (1972). *See generally* J. Nowak, R. Rotunda, J. Young, Constitutional Law, at 289–91 (2d ed. 1983).

Equally important as the right to freedom of movement are the first amendment rights of free speech and assembly. *See* U.S. Const. amend. I; Wis. Const. art. I, secs. 3 and 4. *See generally Jacobs v. Major,* 139 Wis. 2d 492, 504, 407 N.W.2d 832 (1987); *State v. Zwicker,* 41 Wis. 2d 497, 509, 164 N.W.2d 512, *appeal dismissed* 396 U.S. 26 (1969); *N.A.A.C.P. v. Alabama,* 357 U.S. 449 (1958). Appellants argue that the broad language employed within the curfew ordinance precludes youths' attendance of events involving rights of assembly, speech and expression, including, for example, rallies, meetings, and other public events.

Additionally, to the extent that the ordinance might incidentally interfere with a juvenile's atten-

dance of religious activities, after curfew hours, a fundamental right is implicated. *See* U.S. Const. amend. I; Wis. Const. art. I, sec. 18. *See generally Wisconsin v. Yoder,* 406 U.S. 205 (1972), *aff'g* 49 Wis. 2d 430, 182 N.W.2d 539 (1971); *City of Washburn v. Ellquist,* 242 Wis. 609, 9 N.W.2d 121, *reh'g denied* 242 Wis. 616a, 10 N.W.2d 292 (1943). Appellants assert that the free exercise of religion may be hampered due to the operation of the ordinance by, for example, prohibiting a minor from attending a midnight church service.

Finally, appellants argue that the ordinance unconstitutionally interferes with familial autonomy. Appellants are correct that the freedom of parents to rear their children according to their own system of beliefs is an interest of constitutional magnitude. *See, e.g., Yoder,* 406 U.S. at 232–33. *See also Wynn v. Carey,* 592 F.2d 1375, 1385–86 (7th Cir. 1978). That the state must not unnecessarily intrude into the family life has long been recognized:

> "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Pierce v. Society of Sisters,* [268 U.S. 510 (1925)]. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 U.S. 158, 166, *reh'g denied* 321 U.S. 804 (1944).

*See also H.L. v. Matheson,* 450 U.S. 398, 410 (1981); *Ginsberg v. New York,* 390 U.S. 629, 639, *reh'g denied* 391 U.S. 971 (1968).

43

The right to challenge invalid government intrusion upon constitutionally protected rights is not one which may only be asserted upon the attainment of any particular age. *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 74 (1976). *See, e.g., Zbaraz v. Hartigan,* 763 F.2d 1532, 1536 (7th Cir. 1985), *aff'd* 108 S. Ct. 479 (1987), *reh'g denied* 108 S.Ct. 1064 (1988) ("The constitutional rights of minors do not receive lesser protection than the rights of adults."). However, it has become a well-recognized precept of constitutional law that a statute or ordinance which might be unconstitutional as applied to an adult might be constitutional as applied with respect to juveniles. *See Prince,* 321 U.S. at 167–70. This principle arises from a state's legitimate interest in the protection of the welfare of children. *Id.* at 165; *Ginsberg,* 390 U.S. at 640. Recently, the United States Supreme Court again examined a question involving the first amendment rights of students. Although asserted in the context of a school environment and thus involving additional considerations, it is instructive to observe the Court's reaffirmation of the notion that while juveniles possess fundamental rights entitled to constitutional protection, they are not "'automatically coextensive with the rights of adults . . . .'" *Hazelwood School District v. Kuhlmeier,* 108 S. Ct. 562, 567 (1988) (quoting *Bethel School District No. 403 v. Fraser,* 478 U.S. 675 (1986)). *See also Ginsberg,* 390 U.S. at 638.

The nature of the authority of the state to regulate juvenile conduct was succinctly expressed by Justice Brennan in *Carey v. Population Services International,* 431 U.S. 678, 692 (1977), as follows:

44

"The question of the extent of state power to regulate conduct of minors not constitutionally regulable when committed by adult is a vexing one, perhaps not susceptible of precise answer. We have been reluctant to attempt to define 'the totality of the relationship of the juvenile and the state.' *In re Gault*, 387 U.S. 1, 13 (1967). Certain principles, however, have been recognized. 'Minors, as well as adults, are protected by the Constitution and possess constitutional rights.' *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S., at 74. '[W]hatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone.' *In re Gault, supra,* at 13. On the other hand, we have held in a variety of contexts that 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults.' *Prince v. Massachusetts,* 321 U.S. 158, 170 (1944). See *Ginsberg v. New York,* 390 U.S. 629 (1968). See also *McKeiver v. Pennsylvania,* 403 U.S. 528 (1971)."

The rationale underlying the need for special sensitivity regarding the application of constitutional principles to children was explained in *Bellotti v. Baird,* 443 U.S. 622, 634 (plurality), *reh'g denied* 444 U.S. 887 (1979), as a need to accommodate the following: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." Significantly, the state's augmented authority over children has been recognized as most appropriately exercised with respect to activities carried out in public places where the dangers to the juvenile are the greatest. *See Prince,* 321 U.S. at 168.

45

Having reviewed the ordinance not only with respect to the particular activities as to which it was applied in the instant case, but also with respect to its hypothetical interference with other rights in different circumstances, we are convinced that given the greater authority of the state or municipality regarding the regulation of the activities of children, the ordinance is not overly broad. Moreover, while parental interests in rearing children without state or municipal interference may be impinged upon by the ordinance, we concur with the United States Supreme Court that where "[a]cting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control ...." *Prince,* 321 U.S. at 166. The state does indeed have "a wide range of power for limiting parental freedom and authority in things affecting the child's welfare ...." *Id.* at 167.

We are convinced that the interest of the municipality in the present case in protecting youths and curtailing juvenile crime is compelling and further are of the position that the ordinance, which restricts juvenile activity for only a narrow period of the day in "public" places, is drawn as narrowly as practicable. In this regard, it should be noted that juveniles accompanied by adults having care, custody, or control of the juveniles are free from the constraints of the curfew ordinance. Accordingly, because we find that the ordinance meets the strict scrutiny standard requiring a "compelling state interest," it is unnecessary to determine whether we would adopt the less

stringent "significant state interest" test applied in *Carey* with respect to juveniles. *Carey,* 431 U.S. 678.[10]

We note that the appellants' concerns regarding the enforcement of the ordinance in certain hypothetical contexts are founded upon an extremely liberal and, we posit, preposterous construction of the ordinance. The constitutionality of the ordinance must not be judged by lifting terms such as "stand" from the ordinance and, without regard to the purpose and context of the ordinance, suggesting hypothetical situations as to which the term, antiseptically defined, might apply. As explained in *Boos,* 108 S. Ct. at 1169, regulatory language should be interpreted in light of that "particular context" for which it is crafted. *See also Grayned,* 408 U.S. at 112. Furthermore, this court must interpret an ordinance, as it would a statute, to preserve its constitutionality. *See, e.g., Bachowski,* 139 Wis. 2d at 405. *See also Boos,* 108 S. Ct. at 1168.

---

[10]The Court noted, regarding the lesser standard applied in *Carey,* as follows:

"This test is apparently less rigorous than the 'compelling state interest' test applied to restrictions on the privacy rights of adults. See, *e.g.,* n. 16, *infra.* Such lesser scrutiny is appropriate both because of the States' greater latitude to regulate the conduct of children, *Prince v. Massachusetts,* 321 U.S. 158 (1944); *Ginsberg v. New York,* 390 U.S. 629 (1968), and because the right of privacy implicated here is 'the interest in independence in making certain kinds of important decisions,' *Whalen v. Roe,* 429 U.S. 589, 599–600 (1977), and the law has generally regarded minors as having a lesser capability for making important decisions. See, *e.g., Planned Parenthood,* 428 U.S., at 102 (Stevens, J., concurring in part and dissenting in part)." 431 U.S. at 693, n. 15.

*But see Zbaraz,* 763 F.2d at 1537 (applying compelling state interest standard).

47

Accordingly, the appellants' contention that the ordinance would apply to a minor walking directly home from work or standing while waiting for a bus home is invalid; such activities are certainly not within the proscription of the ordinance, the purpose of which, as indicated in the entitlement of the ordinance, "Loitering of Minors," is to prevent the undirected or aimless activity of minors during the curfew hours. While it is conceivable that a police officer could mistakenly or even willfully apply the ordinance to a youth who was, for example, walking directly home or standing while waiting for a bus, the potential of such improper application of the ordinance does not destroy its constitutionality: "[T]he fact that a law may be improperly applied or even abused does not render it constitutionally invalid." *Wilson,* 96 Wis. 2d at 21.[11] Furthermore, as has been stated by the United States Supreme Court, "even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct ....'" *Parker,* 417 U.S. at 760

---

[11]The testimony taken at trial indicates that the police officers involved in this matter did not, in fact, in the enforcement of the curfew law, adopt the broad interpretation of the ordinance posited by the appellants:

> "Q [Attorney for appellants, Robert Courtney] Are there any other exceptions as you understand the law? If they were on, in a public place, they were, they had a lawful purpose and were on their way home or their intent was to go home and they obviously were not loitering, congregating or standing; that would be the exception, correct?
>
> A [Milwaukee police officer Kevin Von Bank] Yes."

48

(quoting *CSC v. Letter Carriers,* 413 U.S. 548, 580–81 (1973)).

Finally, we have noted the cases of *Bykofsky v. Borough of Middletown,* 401 F. Supp. 1242 (M.D. Pa. 1975), *aff'd* 535 F.2d 1245 (3d Cir.), *cert. denied* 429 U.S. 964 (1976), and *Johnson v. City of Opelousas,* 658 F.2d 1065 (5th Cir. 1981), relied upon respectively by respondent and appellants.[12] We are more persuaded by the analysis applied by the court in *Bykofsky.* In this regard, we note that the curfew ordinance in *Bykofsky* was somewhat more liberal than the Milwaukee ordinance, to the extent that it provided exception to the ordinance proscription for first amendment activities where notice, signed by the minor and parent, if practicable, was first given to the mayor. However, the analysis applied in *Bykofsky* is equally relevant to the present case. As observed in *Bykofsky:*

> "Obviously, the ordinance in fact promotes the safety of younger children by keeping them off the streets after 10:00 P.M. unless accompanied by an adult. ... [I]t is apparent that some juvenile crime is prevented, such as the 'spur-of-the-moment' nocturnal crime and mischief resulting from group or gang action, because accumulations of juveniles are easily detected and can be dispersed under the curfew." 401 F. Supp. at 1255–56.

[12]For a survey of additional cases discussing curfew ordinances, see Annotation, *Validity and Construction of Curfew Statute, Ordinance, or Proclamation,* 59 A.L.R.3d 321, §§ 5–6 (1974). *See also* 6A E. McQuillin, The Law of Municipal Corporations, § 24.111 (3d ed. 1988).

49

The court, giving due consideration to both the fundamental rights of minors and the special interests of society in regulating youth activities, consequently concluded as follows:

> "The interest of minors in being abroad during the nighttime hours included in the curfew is not nearly so important to the social, economic, and healthful well-being of the community as the free movement of adults. ... The curfew ordinance recognizes the dangers to which minors are subject if allowed at nighttime to be upon the streets unattended by adults. Legislation peculiarly applicable to minors is necessary for their proper protection. Likewise, due to their immaturity, legislation peculiarly applicable to minors is warranted for the protection of the public, e.g., to protect the community from youths aimlessly roaming the streets during the nighttime hours." *Id.* at 1256–57.

We likewise find the Milwaukee curfew ordinance to be supported by the compelling interest of the city in controlling the nighttime activities of youths in order to protect both youths and the community from juvenile crime. Accordingly, for all the above reasons, we affirm the decision of the trial court.

*By the Court.*—The order of the circuit court is affirmed.

HEFFERNAN, CHIEF JUSTICE (dissenting). A properly drafted curfew ordinance is constitutional and will serve the societal protectionary purposes for which it is intended. The Milwaukee ordinance is not such an ordinance.

The ordinance in question purported to prohibit late night "loitering" by children. It, however, was

used to arrest and take into custody black youngsters who were attending a social affair, sponsored by an accredited university student group, which had as its purpose the encouragement of post-high-school education. An ordinance drawn in such a manner as to be subject to a construction that permits such a result is not just unconstitutional. It is malignantly outrageous. Because the majority errs in finding constitutional what is clearly unconstitutional, I dissent.

The issue in this case is not whether Milwaukee may have a juvenile curfew ordinance. It is rather obvious it may have, but that question is not at issue. The issue in this case is rather the degree of precision that such an ordinance requires. The correct result in this case would be to find this ordinance unconstitutional, as it surely is, and to allow the City of Milwaukee to draft, as it can, a better one.

The ordinance here is challenged on two grounds—vagueness and overbreadth. It fails both challenges. Even if I were to accept the majority's finding on the question of standing, the ordinance is vague for several reasons.

To begin with, as the majority correctly states, one test for vagueness is whether one "'bent on obedience'" to the law can discern what behavior is prohibited. At 33. In this case, however, it is clear that K.F. and D.A., the defendants here, could not discern what behavior was prohibited. This is because, as the facts of this case show, the ordinance does not give notice of the prohibited behavior.

According to the findings of the trial court, K.F. and D.A. have unblemished records. They come from responsible families, and there is not the slightest indication that they have ever been involved with any gangs or in any misconduct.

51

These two juveniles, along with 400 others, apparently all black youths, decided to attend a dance which was being promoted over radio, and by word of mouth in area high schools. This dance was sponsored by the Black Student Union of the University of Wisconsin-Milwaukee, a recognized student organization in good standing there.[1] The purpose of the dance was to reach out to black high school students to persuade them of the benefits of a higher education and to encourage them to go to college.

Given the educational purposes of the dance, it is reasonable to conclude that many juveniles with excellent backgrounds similar to K.F.'s and D.A.'s also chose to attend. Unfortunately, none of these juveniles could know that earlier that day, in a location *over five miles distant* from the War Memorial Center, police were called to investigate suspected gang activity and that, at that time, an unnamed citizen informer had led police to believe that there might be gang-related activities at this beneficial, educational dance. Relying in all probability on the sponsored and public nature of the dance, on its favorable location in a neighborhood not normally beset with gang activity, and on its beneficent purpose, the juveniles in this case went there, stayed at the dance past Milwaukee's 11:00 P.M. juvenile curfew, and ended the evening with a new acquisition—a juvenile record.

[1] The Black Student Union's good reputation is further indicated by the fact that they were allowed to use the War Memorial Center in the first place. According to the executive director of the center, the center is only available to "qualified organizations," such as veterans groups, and "civil educational organizations." Further proof of the union's good standing is the fact that this dance was not the first they had sponsored at the War Memorial.

Were this all that occurred, this would be a tale of simple misfortune, an example of ignorance of the law which leads to unfortunate results. The reason this unfortunate scenario rises to the level of an unconstitutional denial of procedural due process is because, even had these juveniles consulted Milwaukee Ordinance 106–23 carefully before they left for the evening, they would not, with any assurance, have been able to conform their behavior to the requirements of law. This problem arises because the ordinance was enforced in a way which was not spelled out in the ordinance itself, but instead was enforced in a way which comported with the way the police on the scene thought it ought to be enforced on an *ad hoc* basis.

The test for vagueness is broader than that quoted by the majority. At 32–33. While it is true that the test is whether either one bent on obedience or a trier of fact could reasonably ascertain what the rule proscribes, this court has consistently also recognized another factor which must be considered, and that is the entity or agency charged with enforcing the rule. Thus, in *City of Milwaukee v. Wilson,* 96 Wis. 2d 11, 16, 291 N.W.2d 452 (1980), this court stated:

> "A statute of ordinance is unconstitutionally vague if it fails to afford proper notice of the conduct it seeks to proscribe *or if it encourages arbitrary and erratic arrests and convictions.* The test to determine vagueness is whether the statute or ordinance is so obscure that men of ordinary intelligence must necessarily guess as to its meaning and differ as to its applicability. In order to withstand a vagueness challenge ... [the law] must be sufficiently definite so that ... *those who are charged either with enforcing or applying it are not relegated to creating their own standards* of culpa-

bility instead of applying the standards prescribed in the law." (Emphasis supplied.)

Thus, under this standard, a question which the majority has left unanswered is whether one who wishes to "enforce or apply" the law is "relegated to creating their own standards of culpability instead of applying the standards prescribed in the law." *Id.* Recourse to the facts of this case demonstrates that the police here did, in fact, "create their own standards of culpability."

As the majority correctly states, the juveniles who were ultimately arrested were "congregating" at the War Memorial Center in downtown Milwaukee. At 35. As the majority also further correctly states, a police officer testified that "youths whose parents had arrived to pick them up at the War Memorial Center were permitted to leave without the issuance of citations...." At 30.

This means that some youths who were congregating were issued citations, while others, who were equally guilty of congregating, were not charged because, after they had been forcibly prevented by police seeking "gang members"[2] from further "congregating," their parents "arrived" to pick them up. Because, as the majority also states, the police did not arrive on the scene until after 11:15 PM (at 30, n. 1), the parents who arrived must necessarily have arrived after this time, which means that the parents

[2]Interestingly, despite the apparently great fear the police had of gang activity, and despite the predictions of gang activity they seem to have found at or near the War Memorial Center, no arrests for any type of gang activity were made in that immediate area on the night in question. The only arrests relevant to the instant situation were made for violation of the curfew ordinance.

54

were not on hand for some time after the 11:00 PM curfew had already passed.[3]

These facts are significant because of the heavy reliance placed in the opinion upon the term "accompany." According to the majority holding, the juveniles in the hall were not "accompanied" by adults, as required by the ordinance, because, although there were undisputably adults present, these adults were not those to whom the ordinance referred when it exempted from the reach of the ordinance those juveniles who are "accompanied" by an adult having their "care, custody and control." This is because, again according to the majority, the term "accompany" "unambiguously refers to individualized supervision." At 38.

Yet, according to the fact as laid out by the majority, juveniles whose parents "arrived" were allowed to leave without citations. These parents could not have been exercising "care, custody and control" if they did not even arrive on the scene until after the police did. Even if these parents were waiting outside, they could not have been exercising "care, custody and control" of an individualized nature

---

[3]It appears from the record that starting at 10:50 P.M., ten minutes before curfew time, the security staff of the student organization refused to allow juveniles to use the telephones to call their parents, nor were juveniles allowed to leave the premises. K.F. and D.A. both testified that they wished to leave the scene at 10:50 P.M., but were not allowed to do so. One also testified that she wished to call her aunt to fetch her. Had K.F. and D.A. been able to accomplish either of these goals, they would have been well away before the curfew. If, as the majority states at 47–48, juveniles who are walking straight home or who are waiting for a bus are not subject to the curfew (a matter which is discussed infra at 43), then these two juveniles would never have been in any trouble at all.

because the juveniles were inside and the parents outside. Thus, it is clear that the police made a judgment call in allowing certain juveniles, but not others, to leave without citations. Further, it is clear that this court, in accepting such behavior as unremarkable, is also making a judgment call concerning the correct way the ordinance ought to be applied.[4] Yet these types of spur-of-the-moment judgment calls are exactly what this court has previously forbidden. Here, "those who are charged either with enforcing or applying [the law] are ... relegated to creating their own standards of culpability instead of applying the standards prescribed in the law." *Wilson* at 16.

The law, according to the majority "unambiguously refers to individualized supervision," yet, despite this, because the police, and this court, have decided that those juveniles whose parents arrived after the fact of post-curfew-time congregation could go free despite no provision in the ordinance for such exceptions, it follows that the ordinance does not contain a "standard prescribed in the law." The standard being applied here is instead that of the police and this court's own standard of culpability. The ordinance is unconstitutionally vague.

There is still another ground on which the ordinance is unconstitutionally vague. The majority, as stated above, places heavy reliance on the word "accompany" and cites Webster's Third New International Dictionary for the proposition that the word "unambiguously refers to individualized supervision." At 38. However, the standard for consulting the

---

[4] This is made even clearer by recourse to footnote 11. At 48. There, the court cites a police officer's testimony to demonstrate that the ordinance, *as an individual police officer would apply it*, would not result in a "broad interpretation."

dictionary is not only what Webster's has to say, but instead what "a recognized dictionary" has to say. *Id.*, citing *State v. McCoy,* 143 Wis. 2d 274, 421 N.W.2d 107 (1988).

In this regard, it is instructive to note that Funk and Wagnall's New Standard Dictionary of the English Language, 1940, defines "accompany" as: "[t]o go with, or be associated with, as a companion, an attendant, or a retinue; escort or convoy ..." Similarly, the just published Random House Dictionary of the English Language, Unabridged, Second Edition (1987), gives as the primary and secondary definitions: "1: to go along or in company with; to join in action; ... 2: to be or exist in association or company with." Unlike the definition quoted in the opinion, neither of these definitions compels any conclusion that the word at issue "unambiguously refers to individualized supervision." In fact, given such terms as "escort," "attendant," and such phrases as "to go along with," it is apparent that the word "accompany" has many more shades of meaning than a one-to-one relationship, and thus accepted dictionary definitions are themselves vague when applied in the context of this ordinance.

Given that this is so, it is further apparent that the ordinance is vague because it does not make clear what proportion of adults to juveniles there must be before the necessary ratio for "accompaniment" has been achieved. In this context, it becomes apparent that the ordinance, as applied to these individuals is unconstitutionally vague, because it is undisputed that there were many adults present at the dance, and a reasonable juvenile could well have believed that they were in the "accompaniment" of an adult and, hence, were under the exception for such accompaniment made by the ordinance. Such an impression was,

57

no doubt, reinforced by the sponsored nature of the dance and by the extensive publicity which accompanied it.

There is yet another ground on which the ordinance is vague. As the majority correctly notes, the ordinance prohibits congregation in a "public building." At 35. This raises the issue of whether the War Memorial Center qualifies for this appellation. There is no doubt that the War Memorial is a public building in the sense that the public may have access to it under certain circumstances, and it is a publicly owned municipal building. However, it is not as clear whether this makes it a "public building" when a private affair is being conducted there.

In this case, the executive director of the War Memorial Center testified that the regulations of the War Memorial Center do not allow public dances and that the dance was, in his opinion, as well as in the opinion of the dance organizers, a private one. Hence, the question is whether, even when rented for a private dance, the War Memorial retained its identity as a "public building" such that the reach of the ordinance extended to it.

Inasmuch as this is a question of law, the opinion of the director that the building is "'public' by 'any definition'" (at 35) is neither helpful nor dispositive.[5]

---

[5]It is also neither helpful nor dispositive to know how sec. 101.01(2)(g), Stats., defines public building. At 36. This is because sec. 101.01(2)(g) appears in the chapter on Industry, Labor and Human Relations in respect to the safe place statute and safety regulations in the workplace. As such, it is of no relevance in construing the term "public building" in a criminal or quasi-criminal context such as a juvenile ordinance.

As this court recently indicated in *State v. Crowley,* 143 Wis. 2d 324, 342–44, 422 N.W.2d 847 (1988), because one statute

When a group rents a "public building" for a private function, they do not expect that others will consider them to still be "in public." Thus, one who rents a hotel room expects that he will be able to enjoy the privacy he expects in his own home. *Cf. United States v. Kwitek,* 433 F.2d 18 (7th Cir. 1970) (hotel room treated same as home for search-and-seizure purposes). Yet a hotel room is clearly within the definition of sec. 101.01(2)(g) as a lodging in a public building. Secure in this expectation of privacy, he will engage in the most private behavior imaginable, while still within a building that, for other purposes, is considered "public." Similarly, a business group holding a meeting in a rented public hall does not expect that, because the hall is a "public" one, its confidential communications concerning business projections, patents, formulas, manufacturing processes, etc., will thereby become public. Consistent with these examples, a group renting a public hall for a dance targeted at youth, with the purpose of indoctrinating these youth into the benefits of higher education may well

embodies a similar nomenclature as another, it does not follow that the definition adopted in the context of one statute can or should be uncritically adopted in the context of the second statute. Thus, in *Crowley* we specifically rejected the argument that, because a man was not "handicapped" under the Wisconsin Fair Employment Act, secs. 111.31 to 111.395, Stats., he was not "disabled" for the purposes of a battery statute, sec. 940.19(3).

Similarly, in this case we should reject incorporation into the quasi-criminal or criminal setting presented here of the purely civil statute definition of "public building" contained in sec. 101.01(2)(g), which definition is intended to aid in regulating such matters as pilot lights on stoves, flushing devices for urinals, and smoke detectors, to name but a few. Because the purposes of the two laws are so completely different, the definitions in these very different contexts should be independently arrived at also.

be said to have the same expectations of private use of the hall as a business group or an individual. And if the use is "private" in this manner, the fact that it takes place in a public building is irrelevant. The purpose of the Milwaukee Juvenile Curfew Ordinance, as indicated by its title, is to prevent "loitering," and it is to this end that juveniles are controlled when they are on public premises. Because attendance at a private dance in a public hall is not "loitering," so the ordinance's use of the term "public building" cannot be said to embrace the dance at issue here.

The point to be made with this example is that, because the ordinance does not undertake to define "public building," it must fall for vagueness. The fact that this court is divided on the issues of whether the War Memorial Center, when rented for a private dance, is a "public building" demonstrates that the language here is anything but unambiguous. The mere fact that this court is divided on this matter of law, makes clear that juveniles intent on conforming their behavior to the mandate of the law will be unable to do so. Thus, as in the case of what is meant by "accompany," the ordinance does not carry on its face or within it a "standard prescribed in the law." *Wilson* at 16. For this reason, also, the ordinance must fall for vagueness.

Basically, the majority here avoids meaningful discussion of vagueness inherent in this poorly worded statute by declaring that the appellants have no standing to raise the issue. I do not address the issue of whether the majority is correct or incorrect on this matter, but this court has the inherent power to review questions of great public importance even when the parties would not ordinarily have the standing to raise the issues. *Town of Germantown v.*

60

*Village of Germantown,* 70 Wis. 2d 704, 710, 235 N.W.2d 486 (1975). Under this public policy standard, I would review the balance of the ordinance at issue.

This ordinance prohibits such activities as "strolling," "wandering," and "standing." It is claimed by the city and the majority that these prohibitions do not extend to prohibit "walking" or "waiting for a bus." However, these self-generated contentions again demonstrate that the ordinance is vague. At what point does the prohibited "strolling" become the supposedly permissible "walking"? At what point does the supposedly permissible "waiting for a bus" become the impermissible "standing"? These questions again illustrate the vague nature of the ordinance, and demonstrate that one bent on compliance would not know how to conform his behavior, while those charged with enforcement are "relegated to creating their own standards" because no standard is "prescribed in the law." *Wilson* at 16.

Given the foregoing, the ordinance should fall for vagueness, and this is true whether one accepts the majority's holding on the juvenile's standing to challenge the ordinance for vagueness or not. Under any theory of standing, the ordinance must fall. However, vagueness is not the only flaw inherent and facially apparent in this ordinance. The statute also suffers from impermissible overbreadth.

As the majority correctly states, juveniles, like adults, have the right to freedom of movement and travel, as well as freedom of association, assembly, speech, expression and religion. At 40–43. However, as the majority also correctly states, in the case of juveniles, these rights are counterbalanced by the state's police power, as well as the state's *parens patriae* power. At

44–46. Thus, in terms of overbreadth, the question at issue is whether the ordinance reflects a proper balance between the state's power on the one hand, and the juvenile's rights on the other. The resolution of this question, in turn, depends to a large measure on the level of scrutiny adopted for the review of the state's interests.

In this case, the majority declines to specify which is the appropriate level of scrutiny, but instead concludes that, even if the most stringent level of scrutiny is adopted—that the state's interests are examined to determine if these interests are "compelling," rather than merely "significant"—the ordinance here passes muster. At 46. Adopting the basic approach of the majority, I conclude that, even if the state's interest need only be "significant" rather than "compelling," the ordinance is unconstitutional.

As stated above, this ordinance is directed at preventing "loitering." The majority defines this as an intent to prevent "undirected or aimless activity of minors during the curfew hours." At 48. The parties agree, and this dissent agrees, that juvenile ordinances are designed to (1) reduce juvenile crime, (2) protect children from nocturnal dangers, and (3) reinforce parental authority. The quickest proof that this ordinance is overbroad is to recognize that the juveniles here were not engaged in loitering or other undirected or aimless activity. Instead, these juveniles were attending a dance with an indisputably beneficial and socially desirable educational purpose. Given that purpose, it is reasonable to say that the dance itself was designed to reduce juvenile crime, because a better educated populace is presumably one less attracted to crime by either need or inclination. Thus, the fact that the ordinance can reach these juveniles in an educational and socially desirable setting makes

62

the ordinance *ipso facto* overbroad and its enforcement here absurd. The ordinance was not being enforced here to effectuate its purposes, nor was it effective in reaching the purported targeted behavior.

An analysis of prior holdings also compels the conclusion that the ordinance here was overbroad. Two of the leading cases in this field which span the gamut of results, as well as the range of sophistication of ordinances at issue, are *Bykofsky v. Borough of Middletown*, 401 F. Supp. 1242 (M.D. Pa. 1975) and *Johnson v. City of Opelousas*, 658 F.2d 1065 (5th Cir. 1981).

*Bykofsky* involved a juvenile ordinance which passed constitutional scrutiny. The ordinance there was narrowly drawn compared to the one at bar here. For example, that ordinance made specific exceptions for juveniles who were "exercising first amendment rights," "in a case of reasonable necessity," when "the minor is on the sidewalk [in front] of his residence," when "the minor carries a certified card of employment," when "the minor is returning home by a direct route from, and within thirty minutes of the termination of, a school activity or an activity of a religious or other voluntary association." Many of these exceptions, but not all, required that the minor have previously given notice to the mayor of his intention to utilize the specific exemption which applied to his situation.

In the face of an overbreadth challenge, the court upheld this ordinance as constitutional, with only such minor deletions as "normal nighttime activities," which phrases were considered too vague to gain court approval. The court reasoned that this ordinance was sufficiently specific to pass muster under the overbreadth challenge because it was not written so

broadly that it impinged on constitutional rights. This carefully thought out case illustrates what an essentially acceptable juvenile ordinance provides.[6]

The Milwaukee ordinance does not approach this degree of specificity. Nevertheless, in itself, this observation does not mean that, simply because the Milwaukee ordinance is not as specific as the one which passed muster in *Bykofsky,* the Milwaukee ordinance is overbroad.

The clearly dispositive case is *Johnson v. City of Opelousas.* In that case, the fifth circuit court of appeals held unconstitutional an ordinance which is remarkably similar to the Milwaukee ordinance. Milwaukee's ordinance and the Opelousas ordinance both forbade such activity as "traveling, loitering, wandering, strolling and playing." The parental exemption was for "parents, tutor or other responsible adult." Also as in Milwaukee's ordinance, the purposes asserted to underlie the Opelousas ordinance were the protection of youths from nighttime dangers, reducing nocturnal juvenile crime, and enforcing parental control and responsibility for their children. The court wrote:

> "In *Bellotti v. Baird,* 443 U.S. 622, 633–39 ... (1979), four of the eight justices joining in the majority holding set out three reasons explaining why some situations justify the placement of restraints on minors which would be unconstitutional if placed on adults: 'the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.'

---

[6]The ordinance covers eight closely typeset pages. This is in contrast to Milwaukees, which covers not quite two typewritten pages.

... If the statute, regulation, or ordinance under question is based on any of these factors, 'we would be required to determine the strength of the support provided, its relation to the [enactment] as a whole, and the extent, if any, to which it might serve to justify any special restraints on the ... rights of minors.' ... We need not conduct such an inquiry ... since none of the three factors ... apply to the overly broad restrictions with which we are concerned." *Id.* at 1073.

The court then went on to explain that, because the statute simply cut off the juveniles' rights of free association, travel, and first amendment expression, the statute was overbroad and, hence, unconstitutional.

A comparison of *Bykofsky's* ordinance with that found in *Opelousas,* and a comparison of both of those ordinances with Milwaukee's, demonstrates that Milwaukee's ordinance is very similar to the Opelousas ordinance which was found unconstitutional, and very different from the *Bykofsky* ordinance which received approval. Thus, federal constitutional law, as well as simple logic, both dictate a holding that Milwaukee's ordinance is overbroad.

I conclude that the ordinance at issue here is unconstitutional, because it is both vague and overly broad. I dissent from the majority opinion.

I am authorized to state that JUSTICE ABRAHAMSON and JUSTICE WILLIAM A. BABLITCH join in this dissent.