STATE of Wisconsin, Plaintiff-Respondent,

v.

Anthony PITTMAN, Defendant-Appellant-Petitioner.

Supreme Court

*No. 91–1413–CR. Oral argument November 4, 1992.—Decided March 10, 1993.*

(Also reported in 496 N.W.2d 74.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Jack E. Schairer,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Sharon Ruhly,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

STEINMETZ, J.   There are five issues presented in this case. First, in a criminal prosecution under sec. 940.225(2)(d), Stats., "sexual intercourse with a person who the defendant knows is unconscious," whether an expert's opinion that a woman under hypothetical conditions similar to those presented in this case could not sleep through a complete act of sexual intercourse was properly excluded by the trial court under sec. 904.01 (relevant evidence) and sec. 907.02 (expert testimony), given the following circumstances:

1.   The victim claimed that the defendant had sexual intercourse with her while she was asleep.

2. The hypothetical facts upon which the expert's opinion was based, although similar to the instant facts, differed from those facts in certain critical respects.

3. The expert would have testified that the amount of stimulation needed to wake a person up varies with each individual.

4. The expert did not examine the victim.

Second, under the foregoing facts, whether expert testimony on the stages of sleep, the effects of alcohol on sleep, and the amount of stimulation needed to arouse someone from sleep was properly excluded by the trial court under sec. 904.01, Stats., and sec. 907.02.

Third, under the foregoing facts, whether a chart that determines a person's blood alcohol concentration ("BAC") by number of drinks consumed and body weight was properly excluded by the trial court under sec. 904.01, Stats., when defense counsel failed to proffer any evidence to establish the effect of intoxication on a person's inhibitions, ability to perceive events, and ability to recall events.

Fourth, whether the trial court's exclusion of the aforementioned evidence violated the defendant's right to present a defense guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Wisconsin Constitution.

Fifth, whether sec. 940.225(2)(d), Stats., is unconstitutionally vague.

We conclude that the trial court properly excluded the above-mentioned evidence and that said exclusion did not violate the defendant's constitutional right to present a defense. We also conclude that sec. 940.225(2)(d), Stats., is not unconstitutionally vague.

On September 17, 1990, the defendant, Anthony E. Pittman, was convicted in Milwaukee county circuit court, the Honorable Frank T. Crivello, of second degree sexual assault, under sec. 940.225(2)(d), Stats., for having sexual intercourse with a person he knew to be unconscious. The court of appeals in an unpublished opinion affirmed the conviction. This court granted the defendant's petition for review. The facts surrounding the alleged assault are detailed below.

On the afternoon of December 25, 1989, the victim, Heidi B., went to her boyfriend, Michael Kelner's, apartment. The couple had planned to spend Christmas day together. After spending some time together in the afternoon, they joined Kelner's downstairs neighbors, Kathy and John Bohn, for a Christmas celebration which included dinner.

After dinner, Heidi and Kelner returned to his apartment. Both parties indicated that they anticipated having sex. While Heidi prepared the bed, Kelner went into the living room. He wanted to play his turn on a board game that he and Heidi's brother had been playing over several days. While doing so, Kelner fell asleep on the living room sofa. Heidi made up the bed, undressed, and laid down to wait for Kelner. She also fell asleep.

Pittman had been staying with Kelner. He was present for the Christmas festivities and dinner. When Heidi and Kelner returned to Kelner's apartment, Pittman remained downstairs and watched a movie with Kathy Bohn. After the movie, Pittman also went up to Kelner's apartment.

Heidi testified that she awoke feeling pressure on her legs and a penis being removed from her vagina. She did not feel entry or thrusting. Heidi indicated and a medical exam confirmed that ejaculation had occurred.

Once awake, Heidi opened her eyes and saw Pittman getting up off of her. Neither she nor Pittman spoke. Pittman turned and left the room. Heidi then got up, wrapped a blanket around herself, and went into the living room. She woke Kelner and told him that Pittman had raped her. Pittman was on the sofa next to Kelner, apparently asleep.

Kelner told Heidi to go downstairs to the Bohn's, notify the police, and notify her brother. She did so. John Bohn came up immediately. Heidi's brother called the police. Kelner and John Bohn detained Pittman until the police arrived.

There was inconsistent testimony as to the amount of alcohol Heidi consumed during the day and evening in question. She testified that she consumed two to three glasses of wine with dinner and that she had no more than two shots of Jack Daniels in the afternoon. She said nothing about champagne or beer. Kelner testified that Heidi drank two glasses of champagne with him in his apartment and may have had "somewhere in the neighborhood of two to three cans" of beer downstairs.

In addition, the timing of events on the day in question is unclear. There was varying testimony on when dinner ended. Heidi stated that she finished dinner at 11:30 p.m. Kathy Bohn testified that dinner ended at 10:45 p.m. Michael Kelner testified that he did not know what time dinner ended, but thought it was around 6:00 or 6:30 p.m.

The record is also unclear as to when Heidi fell asleep. She testified that dinner ended at approximately 11:30, and then she and Kelner went upstairs. Once upstairs, Heidi took her clothes off in the bedroom and did not leave that room thereafter. Kelner testified that he and Heidi left the Bohn residence at around 10:00 or 10:30 p.m., although he did not know the exact time.

Heidi went upstairs first, and Kelner came up about five minutes later. Once upstairs, Kelner observed Heidi come out of the bathroom. She told him that she was going to get ready for bed and then went into the bedroom. Kelner estimated that he fell asleep about 20 to 25 minutes later. Kathy Bohn testified that dinner ended at around 10:45 p.m. and that the victim and Kelner left her apartment 45 minutes later.

The record is similarly unclear as to when the act of intercourse took place. Kathy Bohn testified that she did not know what time Pittman went upstairs. Kelner told a police officer on the scene that he was awakened at 2:55 a.m. Heidi's brother called the police. That call came in at 3:59 a.m. Pittman did not testify.

In addition to testifying about the alleged assault, Heidi testified about some of her personal characteristics. She stated that she weighs 125 pounds, and she also stated that she has two children, ages eleven and four, from prior marriages. Medical reports revealed that Heidi was 29 years old at the time of the incident.

Defense counsel listed a series of medical conditions that could have affected Heidi's ability to sense vaginal penetration. Heidi replied that to her knowledge she did not have any of them. She also stated that she did not have a drug problem and took no drugs on Christmas day.

The jury also heard ample evidence that Heidi was a heavy sleeper. Heidi stated that she has slept through thunderstorms and often sleeps through her alarm. She described how her youngest son would come into her room in the morning, turn on the television full volume, jump on the bed, and kiss her on the face. It would take several minutes of this activity to wake her up. In addition, Heidi stated that she occasionally sleeps through her children's crying at night. Kelner testified that

sometimes Heidi falls asleep with the TV on. Consequently, on the following morning, both the TV and Heidi's alarm which was located near her head would be making noise. Even then, Kelner would still have to shake her to wake her up. He also testified that if the kids cried at night, he would wake up first. He would then have to wake Heidi up by shaking her.

The defense conceded that Pittman had intercourse with Heidi but argued that Heidi consented to and was conscious during the entire act. The defense alleged that Heidi subsequently claimed sexual assault merely to get attention from Kelner or because she felt remorse for engaging in casual sex.

In support of this theory, defense counsel attempted to present expert testimony regarding sleep. In her offer of proof made outside the presence of the jury, defense counsel explained that she intended to put Dr. Paul A. Nausieda, M.D. on the stand. Essentially, Dr. Nausieda's testimony would cover five topics. First, he would state that he had reviewed the police reports and the rape crisis center medical reports.

Second, he would explain sleep architecture. There are four stages of sleep. Each stage is a progressively deeper level of sleep. In addition to the four stages there is a period known as REM sleep, which is the hardest period of sleep from which to awaken someone.

Third, he would explain the effect of alcohol on sleep. Alcohol tends to suppress REM sleep. Moderate amounts of alcohol before bed, *i.e.*, three glasses of wine and two shots of Jack Daniels, tends to make a person wake up at night.

Fourth, he would explain the types of sensory stimulation needed to wake a person. Specifically, he would state that "when a person is asleep . . . they are . . . aware of . . . [the] environment around them . . .." However,

"awareness varies with different people . . .." The amount of stimulation needed to wake a person is "relative to the individual" and what that individual is expecting to occur. When a person expects something to wake them during sleep, they are aroused more easily. Sexual intercourse is a very strong stimuli especially for someone who expects to have sex.

Fifth, he would answer a hypothetical question in the negative. Defense counsel would ask whether to a reasonable degree of medical certainty a woman could sleep through entry of a penis into her vagina and sexual intercourse to ejaculation, awakening only to feel the penis withdraw from her vagina, under the following circumstances: (1) the woman was 29 years old and had no medical problems; (2) the woman weighed 125 pounds; (3) the woman consumed two shots of Jack Daniels at around 5:00 p.m.; (4) the woman had a large meal sometime before 11:00 p.m.; (5) the woman consumed three glasses of wine with the meal; (6) the woman ceased drinking by 11:00 p.m.; (7) the woman went to bed at approximately 11:30 p.m. expecting to have sexual intercourse; and (8) the act of intercourse took place between 2:30 and 3:00 a.m.

The trial court excluded the proposed evidence. It reasoned that "the entire testimony of this proposed witness would constitute a comment on [Heidi's] . . . credibility." Consequently, the testimony is prohibited by *State v. Jensen,* 147 Wis. 2d 240, 432 N.W.2d 913 (1988) and *State v. Haseltine,* 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984).

In response to the trial court's ruling, defense counsel argued that Dr. Nausieda's testimony would assist the jury by explaining the difference between sleep and unconsciousness. The court replied that "whether or not sleep constitutes consciousness, is irrelevant in light of

*State v. Curtis* [144 Wis. 2d 691, 424 N.W.2d 719 (Ct. App. 1988)]."

In addition to the expert testimony, the defense sought to introduce a blood alcohol chart that determined a person's estimated blood alcohol concentration by the number of drinks consumed and body weight. Additional information concerning wine was sought to be admitted from a Department of Transportation handbook and study guide. Defense counsel stated that the chart combined with previously admitted testimony on Heidi's body weight and alcohol consumption would establish that Heidi's blood alcohol level at the time she went to bed was between .13 percent and .15 percent, over the legal limit for persons driving automobiles. The trial court excluded the evidence concluding that it was irrelevant.

Expert testimony is admissible only if it is relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Section 904.01, Stats. A trial court's decision with regard to the relevance of proffered evidence is a discretionary decision. *State v. Pharr,* 115 Wis. 2d 334, 345, 340 N.W.2d 498 (1983); *Chart v. General Motors Corp.,* 80 Wis. 2d 91, 102, 258 N.W.2d 680 (1977).

In addition to relevance, to be admissible expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Section 907.02, Stats. Expert testimony does not assist the fact-finder if it conveys to the jury the expert's own beliefs as to the veracity of another witness. *Jensen,* 147 Wis. 2d at 156–57; *Haseltine,* 120 Wis. 2d at 96. This is because

"[t]he credibility of a witness is . . . something a lay juror can knowledgeably determine without the help of an expert opinion." *Haseltine,* 120 Wis. 2d at 96. An expert's conclusion as to witness credibility does not assist the jury to evaluate credibility; it usurps their role as " 'lie detector in the courtroom,' " *Haseltine,* 120 Wis. 2d at 96 (quoting *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir. 1973)). To determine whether expert testimony violates this standard, this court will examine the testimony's purpose and effect. Jensen, 147 Wis. 2d at 254–55.

Determining whether expert testimony assists the fact finder is a discretionary decision of the trial court. *State v. Friedrich,* 135 Wis. 2d 1, 15, 398 N.W.2d 763 (1987).

"We review a discretionary decision only to determine whether the trial court examined the facts of record, applied a proper legal standard, and, using a rational process, reached a reasonable conclusion." *State v. Hamm,* 146 Wis. 2d 130, 145, 430 N.W.2d 584 (Ct. App. 1988). This court will not "reverse unless the [trial court's] use of discretion is wholly unreasonable." *State v. Johnson,* 118 Wis. 2d 472, 481, 348 N.W.2d 196 (Ct. App. 1984).

However, if the trial court fails to set forth the reasoning behind its exercise of discretion, we need not reverse if an independent review of the record reveals a basis for sustaining the trial court's action. *Pharr,* 115 Wis. 2d at 343.

Moreover, if the trial court's exercise of discretion demonstrates consideration of improper facts or a mis-

taken view of the law, the reviewing court need not reverse if it can conclude ab initio that facts of record applied to the proper legal standard support the trial court's conclusion. *Johnson,* 118 Wis. 2d at 480–81 (consideration of improper facts); *State v. Sorenson,* 143 Wis. 2d 226, 250, 421 N.W.2d 77 (1988) (misapplication of law); *see also State v. Selders,* 163 Wis. 2d 607, 617, 472 N.W.2d 526 (Ct App. 1991).

██ The trial court properly excluded the proffered hypothetical question (topic five above). The question is excludable on several grounds.

We recognize that experts do not always have to examine a person to have an opinion; however, here the expert's testimony had no meaning because there was nothing in his testimony to tie his general statements to this case. He would have stated that every individual has different sleep awareness and a unique arousal threshold. Consequently, his testimony was not material and had no bearing on this case.

The hypothetical question is irrelevant to this case for another reason. Its definition of intercourse differs from the legal definition of intercourse. Sexual intercourse is legally defined, in part, as "any . . . intrusion, however slight, of any part of a person's body . . . into the genital or anal opening." Section 940.225(5)(c), Stats. Defense counsel's hypothetical asked Dr. Nausieda whether a woman could sleep through entry of a penis into her vagina and sexual intercourse to ejaculation, awakening only to feel the penis withdraw. Whether Heidi slept through the entire act of intercourse is irrelevant. The issue in this case is whether Heidi was unconscious upon entry, however slight, of the defendant's penis into her vagina.

Second, the hypothetical question fails to assist the jury because it amounts to expert testimony that the victim is lying, contrary to the aforementioned holdings in *State v Jensen,* 147 Wis. 2d 240, 432 N.W.2d 913 (1988) and *State v. Haseltine,* 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984). This point is best explained by comparing the facts of Jensen, where the expert testimony at issue was ruled admissible, and Haseltine, where the expert testimony at issue was ruled inadmissible, to the facts of the instant case.

In *Jensen,* the defendant was convicted of "sexual contact . . . with a person 12 years of age or younger" contrary to sec. 940.225(1)(d), Stats. (1985–86). *Jensen,* 147 Wis. 2d at 248. At trial, an expert on sexually abused children described some of the common behaviors exhibited by such children. *Id.* at 244–45. The expert also stated that in his opinion the victim's behavior was consistent with behaviors commonly exhibited by sexually abused children. *Id.* at 246–47.

The defendant was the child's stepfather. *Id.* at 243. The state submitted the expert testimony in part to rebut the defendant's contention that the child's unorthodox behavior and charges of sexual abuse were part of a plan that she and her mother invented to assist the mother's efforts to obtain custody of the child. *Id.*

This court held that the expert's opinion did not constitute expert testimony that the victim was telling the truth and therefore had been properly admitted. *Id.* at 257. It reasoned that the purpose of the expert's testimony was to rebut the defendant's explanation for the child's behavior. *Id.* The effect of the testimony conformed to its purpose. *Id.* It did not convey to the jury the expert's opinion as to the victim's veracity. *Id.* The jury could not have interpreted it as doing so. *Id.*

The court cautioned, however, that the expert's testimony came close to the inadmissibility line. "[W]hen an expert witness's testimony includes the ultimate comparison [between the victim's behavior and that typical of a sexually abused child], there is a risk that the jury could interpret the testimony as an opinion that the [victim] is being truthful about the assault or that the assault occurred." *Id.* at 256.

*State v. Haseltine* provides an example of expert testimony that crosses the inadmissibility line and constitutes an impermissible comment on a witness's credibility. In Haseltine, the defendant was convicted of having sexual contact with his 16-year-old daughter contrary to sec. 940.225(2)(e), Stats. (1983–84). *Haseltine,* 120 Wis. 2d at 93. A psychiatrist, who was qualified as an expert, testified for the state on "the pattern of behavior exhibited by incest victims." *Id.* at 95. The psychiatrist also stated that in his opinion "there 'was no doubt whatsoever' that Haseltine's daughter was an incest victim." *Id.* at 96.

The trial court allowed the testimony to explain why the victim did not immediately disclose the assault. *Id.* at 98 (Cane, J. dissenting). Haseltine claimed that his daughter was lying and apparently pointed to her delayed disclosure to support this assertion. *Id.*

The court of appeals held that this testimony "goes too far" and should have been excluded. *Id.* at 96. It reasoned that the aforementioned testimony amounted to an expert opinion that the witness was telling the truth. *Id.*

The purpose of the expert's testimony in Haseltine was the same as that in *Jensen:* to rebut the defendant's argument that the victim was lying. However, the effect of the *Haseltine* testimony was much different. It clearly communicated to the jury the expert's own opinion as to

the veracity of the witness. It was this effect that made the testimony improper.

The hypothetical question in the instant case is analogous to *Haseltine* and therefore inadmissible. Heidi claimed that she awoke only to feel the defendant's penis withdraw from her vagina. She did not feel entry. She did not feel thrusting (if there was thrusting). The doctor would have testified that to a reasonable degree of medical certainty a woman under conditions similar to Heidi's could not have slept through entry of a penis into her vagina and intercourse to ejaculation. The purpose of this testimony was to undermine Heidi's credibility and to prove that she was conscious during the act of intercourse, legitimate defense tactics. However, the effect of Dr. Nausieda's testimony would have been to convey to the jury his belief that Heidi was lying. If Dr. Nausieda thinks it is medically impossible for Heidi to sleep through intercourse, he obviously thinks she is lying about doing so. That message would have been communicated to the jury.

Third, the hypothetical question would not have assisted the jury because the factors upon which it was based did not comport with the facts of this case in certain critical respects. The expert's opinion would have been based upon the amount Heidi drank, the time she went to sleep, and the time of intercourse. As explained above, the record indicates that all of these facts were uncertain. In addition, the jury had before it extensive information that the victim was a heavy sleeper, something that was not included in the hypothetical. Finally, the hypothetical was based upon a woman who went to bed expecting to have intercourse. This factor was presumably included because, as Dr. Nausieda's proffered testimony indicated, a person expecting a certain event to wake them during sleep, is

aroused more easily by that event. However, there was no testimony that Heidi expected to be awakened by sexual intercourse. She testified that she expected intercourse before falling asleep.

Fourth, the hypothetical would not have assisted the jury by disabusing them of a commonly held but inaccurate belief. See *Jensen,* 147 Wis. 2d at 250-52; *State v. Robinson,* 146 Wis. 2d 315, 335, 431 N.W.2d 165 (1988). *State v. Robinson* illustrates this point. In *Robinson,* the defendant was convicted of first-degree sexual assault contrary to sec. 940.225(1)(b), Stats. (1987-88). *Robinson,* 146 Wis. 2d at 318. At trial, the defendant attempted to undermine the complainant's claim by pointing out that "she was not crying after the assault and that she was so composed [that] she was able to write out her own statement at the police station." *Id.* at 335. In essence, the defense was attempting "to capitalize on the misconception that all sexual assault victims are emotional following the assault." *Id.* An expert on sexual assault testified that "many victims of sexual assault are emotionally flat immediately after the assault." *Id.* at 333.

This court concluded that the trial court properly admitted the expert testimony, because it assisted the jury. It stated the following:

> [W]e hold that the circuit court did not abuse its discretion by admitting the testimony at issue into evidence because where a defendant has suggested to the jury that some conduct of the victim after the incident is inconsistent with her claim of having been sexually assaulted, the use of expert testimony in relating observations of the way other sexual assault victims actually behave serves a particularly useful role by disabusing the jury of some widely held misconceptions about sexual assault victims.

*Id.* at 335.

In this sense, Pittman's case is quite unlike *Robinson*. Dr. Nausieda's testimony would not have disabused the jury of a commonly held but inaccurate belief. The testimony would have been superfluous. Given the facts of this case, the common belief would seem to be that a person usually would not sleep through an act of intercourse. To the extent that the jury members held that belief, the defendant had no need to disabuse them of it.

The trial court also properly excluded the research information on sleep (topics 1-4 above). Like the hypothetical question, it was irrelevant to this case. Defense counsel's offer of proof indicated that the amount of stimulation needed to wake a person is relative to each individual. Consequently, the general research information said nothing about Heidi's arousal threshold. Moreover, Dr. Nausieda could not tailor this information to Heidi's individual traits, because he neither spoke with nor examined her. The general research information regarding sleep did not provide any information as to a particular person's sleep patterns on a particular night. Consequently, the evidence was not relevant to a material issue in the case.

The defendant argues that the proffered blood alcohol chart, which would have been used to estimate Heidi's level of intoxication, was relevant to her credibility in two ways. First, Heidi's intoxication level bears upon her ability to perceive and recall events. Second, it may have lowered her inhibitions, which bears upon whether or not she consented to intercourse. The defendant also argues that the blood alcohol evidence was relevant to demonstrate the effects of alcohol on sleep architecture and awareness, an important part of Dr. Nausieda's proffered testimony.

■

The trial court properly excluded the chart. It was irrelevant to perception, recall, and consent, because the defendant failed to proffer any evidence establishing the effect that various levels of intoxication have on these issues. In addition, even if we assume that the chart was relevant to Dr. Nausieda's testimony, the defendant's argument still fails because, as explained above, the doctor's testimony was properly excluded.

■

Whether the exclusion of evidence in this case deprived the defendant of his constitutional right to present a defense is a question of constitutional fact which this court reviews de novo. *State v. Pulizzano*, 155 Wis. 2d 633, 648, 456 N.W.2d 325 (1990).

■

Applying this standard of review, we conclude that the defendant's right to present a defense was not violated by the trial court's exclusion of the aforementioned evidence, because the evidence was irrelevant. The compulsory process clause of the Sixth Amendment to the United States Constitution and Article I, Section 7 of the Wisconsin Constitution grant criminal defendants the right to present favorable testimony on their behalf. *Pulizzano*, 155 Wis. 2d at 645. However, this right is not absolute. *Id.* at 646. Defendants only have a right to present relevant evidence. *Id.* As explained above, neither the expert testimony nor the blood alcohol chart were relevant evidence. Consequently, exclusion thereof did not violate Pittman's right to present a defense.

The defendant challenges that portion of section 940.225(2)(d), Stats., that prohibits "sexual intercourse with a person who the defendant knows is unconscious." He argues that this section is unconstitutionally vague.

"The constitutionality of a statute is a question of law" which this court reviews de novo. *State v. Bertrand,* 162 Wis. 2d 411, 415, 469 N.W.2d 873 (Ct. App. 1991). Nevertheless, there are certain standards and presumptions that guide this court when analyzing a defendant's challenge to a statute on vagueness grounds. In *State v. Wickstrom,* 118 Wis. 2d 339, 351-52, 348 N.W.2d 183 (Ct. App. 1984), the court of appeals set forth the applicable standards and presumptions:

> We must indulge every presumption to sustain the constitutionality of a statute. One who challenges the validity of a statute has the burden of showing beyond a reasonable doubt that the statute is unconstitutional. Before a court can invalidate a criminal statute because of vagueness, it must conclude that, because of some ambiguity or uncertainty in the gross outlines of the conduct prohibited by the statute, persons of ordinary intelligence do not have fair notice of the prohibition and those who enforce the laws and adjudicate guilt lack objective standards and may operate arbitrarily. (Citations omitted.)

The first prong of the vagueness test is concerned with whether the statute sufficiently warns persons "wishing to obey the law that [their] . . . conduct comes near the proscribed area." *State v. Tronca,* 84 Wis. 2d 68, 86, 267 N.W.2d 216 (1978). The second prong is concerned with whether those who must enforce and apply the law may do so without creating or applying their own standards. State v. Popanz, 112 Wis. 2d 166, 173, 332 N.W.2d 750 (1983).

The challenged statute, however, "need not define with absolute clarity and precision what is and what is

not unlawful conduct." *State v. Hurd,* 135 Wis. 2d 266, 272, 400 N.W.2d 42 (Ct. App. 1986). "A statute is not void for vagueness simply because 'there may exist particular instances of conduct the legal or illegal nature of which may not be ascertainable with ease.' " *Id.* (quoting *State v. Courtney,* 74 Wis. 2d 705, 711, 247 N.W.2d 714 (1976)). The ambiguity must be such that "one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the statute or rule." *Courtney,* 74 Wis. 2d at 711.

Furthermore, when the alleged conduct of a defendant plainly falls in the prohibited zone, the defendant may not base a constitutional vagueness challenge on hypothetical facts. *Id.* at 713. The statute at issue provides clear notice that sexual intercourse with a person who is asleep is illegal. It therefore satisfies the first prong of the above mentioned test. *State v. Curtis,* 144 Wis. 2d at 695–96, held that the term unconscious, as used in sec. 940.225(2)(d), Stats., constitutes "a loss of awareness which may be caused by sleep." Although *Curtis* involved sexual contact rather than sexual intercourse, it cannot fairly be said that *Curtis* did not put the defendant on notice that the statute prohibits sexual intercourse with a person who is asleep.

The statute at issue also provides an objective standard for those applying the law. Therefore, it satisfies the second prong of the vagueness test. The jury in this case was instructed, in accord with *Curtis,* that "[u]nconsciousness is a loss of awareness which may be caused by sleep." The state's contention in this case was that the victim was unconscious by virtue of being asleep. Obviously, sleep is within the common knowledge

277

of the members of the jury. It cannot fairly be said that the jury did not have an objective standard to apply.

Finally, the defendant's conduct falls squarely in the prohibited zone; therefore, he is precluded from arguing vagueness on hypothetical facts. The state sought to prove that the defendant had sexual intercourse with a person who was unconscious by virtue of being asleep. This alleged conduct clearly falls within the aforementioned definition of unconsciousness.

For the foregoing reasons, we conclude that the trial court properly excluded the expert testimony on sleep and the blood alcohol chart. In addition, these exclusions did not violate the defendant's constitutional right to present a defense. We also conclude that sec. 940.225(2)(d), Stats., is not unconstitutionally vague.

*By the Court.*—The decision of the court of appeals is affirmed.

WILLIAM A BABLITCH, J. *(dissenting)*. I dissent to that portion of the majority opinion which concludes that the circuit court properly excluded expert testimony on the stages of sleep, the effects of alcohol on sleep, the amount of stimulation needed to awaken someone from sleep, and that the research literature reveals no medically proven case of a person sleeping through sexual intercourse. This issue is separate and apart from the primary issue addressed in the majority opinion, the exclusion of the hypothetical question.

The charge here is having sexual contact with one who is asleep. The alleged victim testified that she was asleep during penetration and ejaculation and awakened only upon the defendant's withdrawal. The defense contends that the alleged victim was conscious during the entire act. It is inconceivable that the jury would find this defendant guilty if they believed that the alleged

victim was not telling the entire truth about any component of the acts of penetration, ejaculation, and withdrawal. Thus, knowledge about the physiology of sleep was essential to the jury's conclusion.

Section 907.02, Stats., states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Judicial Council Committee's Note to sec. 907.02, Stats., states that this section:

> is an affirmative approach to the use of expert testimony predicated upon whether such testimony will assist the trier of the fact to understand the evidence or to determine a fact in issue. With such a test expert testimony will usually be admissible and will only be excluded if superfluous and a waste of time." Wisconsin Rules of Evidence, 59 Wis. 2d R207.

Perhaps even more to the point, particularly because the majority opinion lays such heavy emphasis on the hypothetical opinion testimony that was excluded, is the Federal Advisory Committee's Note to the same section:

> An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge.
> . . .
> Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. (This) rule accordingly recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply

them to the facts. *Since much of the criticism of expert testimony has centered upon the hypothetical question, it seems wise to recognize that opinions are not indispensable and to encourage the use of expert testimony in nonopinion form when counsel believes the trier can itself draw the requisite inference. . . .*

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952). Wisconsin Rules of Evidence, 59 Wis. 2d R207–R208.

Much of what a lay person "knows" about sleep is intuitive. Much of what is scientifically known about sleep is counter-intuitive. Dr. Paul A. Nausieda, M.D., is a recognized expert in the physiology of sleep with a substantial portion of his practice devoted to sleep disorders. His curriculum vitae of 23 pages was admitted without objection, and the circuit court judge stated that he was entirely satisfied that Dr. Nausieda was qualified as an expert. Dr. Nausieda was prepared to testify with respect to a number of counter intuitive facts about sleep:

— Moderate amounts of alcohol do not tend to make a person sleep better. To the contrary, alcohol tends to suppress REM sleep and make a person far more susceptible to waking up at night.

— The state of sleep does not render a person unaware of his or her environment. To the contrary, when a person is asleep, they are aware of the environment around them.

— The expectation of an awakening event such as an alarm clock ring or the cry of a baby does allow the person to be awakened more easily.

— Some types of sensory stimuli are greater than others and the expectation of sexual intercourse is a much greater stimuli than the sound of a baby crying or an alarm clock going off.

— In research there is no medical proof or proven case of a person sleeping through sexual intercourse.

These are scientific facts that the defense expert would have testified to for purposes of enlightening the jury on the subject of sleep. To many on the jury, these facts may well have been unknown. Many on the jury may well have believed, based upon their own intuitive knowledge, completely the opposite. The jury was entitled to be enlightened on the subject. The evidence was highly relevant on the issue of whether the alleged victim was asleep at the time of these acts.

Section 904.01, Stats., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The majority excludes this evidence solely on the ground that it was not relevant. The majority is in error. The "existence of fact" here is the fact of sleep: was she or wasn't she asleep? Thus, the sole legal question presented is whether the expert's testimony on the above cited nature of sleep has any tendency to make the question of whether she was sleeping more or less probable. The majority, in one short paragraph, dismisses the defense's position by stating, "[l]ike the hypothetical question, it was irrelevant to this case." Majority op. at 274. Not one further word of explanation.

How is the evidence concerning sleep like the hypothetical question that was rejected? The issue of whether the hypothetical question should have been allowed rests on entirely different principles.

A perusal of the trial transcript reveals the extent to which the prosecution relied on these common misconceptions about sleep to convince the jury that the victim slept through these acts. In the opening statement the prosecutor stated: "[O]n Christmas day there was quite a bit of drinking . . . (The alleged victim) will tell you . . . the amount of drinking and eating that was going on . . . there was wine and other alcoholic beverages being consumed before and during dinner and after dinner. . . . she went in and basically fell asleep. She was tired. She had been drinking. . . ." Trial Transcript pp. 14–16. During direct examination, the following exchanges took place between the alleged victim and the prosecutor:

On page 28 of the Trial Transcript, Prosecutor's Question: "What were you drinking?"

Alleged Victim's Answer: "We had some Jack Daniels at one point and then wine later."

On page 34 of the Trial Transcript Prosecutor's Question: "When you say you fell asleep, how heavy a sleeper are you?"

Alleged Victim's Answer: "Very heavy sleeper."

Question: "Well, to what extent are you aware of what happens that you can hear things going on when you are asleep?"

Answer: "Virtually I don't."

During the closing arguments the prosecutor made the following remarks:

Page 94 of the Trial Transcript—"that's what the guts of this case is. Do you believe . . . [the alleged victim] told you the truth or do you believe she lied to you?"

Page 99 of the Trial Transcript—"she was tired, she had been drinking . . . This was a Christmas holiday, heavy meal and a lot of alcohol consumed."

Page 114 of the Trial Transcript—"How could a woman not know a penis is being put in her vagina? Because of sleep or combination of heavy food consumption, heavy alcohol consumption, whatever.".."

And lastly, showing the prosecutor's reliance on the jurors' intuitive knowledge about sleep, the prosecutor stated: "I think we all—this is where we are asking you to use your common sense." Trial Transcript p. 114.

The problem, of course, is that the jurors' "common sense" in this case involving sleep may have been simply wrong. The expert could have given them scientific facts upon which to base their verdict. He was not allowed to testify. The prosecutor then relied upon those misconceptions to make his case.

This court has routinely, and correctly, allowed expert testimony regarding rape trauma syndrome. *See State v. Robinson,* 146 Wis. 2d 315, 431 N.W.2d 165 (1988); *State v. Jensen,* 147 Wis. 2d 240, 432 N.W.2d 913 (1988). Testimony regarding rape trauma syndrome is allowed into evidence because, as stated in *Robinson,* it is a means of "disabusing the jury of some widely held misconceptions about sexual assault victims." *Robinson,* 146 Wis. 2d at 335. In the case at issue before this court, the defense attempted to put the scientific evidence regarding sleep and the effects of alcohol on sleep before the jury for the very same reasons we have allowed rape trauma evidence: it could disabuse the jury of some widely held misconceptions about sleep. These miscon-

ceptions include the effects of alcohol on sleep, the general awareness levels of a sleeping person, and what the expectation of sensory stimuli, particularly sexual stimuli, does to a sleeping person. These facts, including the fact that in research there is no medical proof or proven case of a person sleeping through sexual intercourse, should have been made available to the jury for at least two reasons: those members of the jury who held erroneous views would have been disabused of them, and those members, if any, of the jury who correctly intuited these facts would know they could rely upon them in their deliberations.

In *Robinson,* as here, one party attempted to take advantage of popularly held misconceptions. This court in Robinson correctly noted:

> The expert testimony in this case was helpful to the jury because the defendant attempted to rebut the complainant's testimony by noting that she was not crying after the assault and that she was so composed she was able to write out her own statement at the police station. The defense attempted to capitalize on the misconception that all sexual assault victims are emotional following the assault. We conclude, therefore, that the witness's testimony in this case assisted the jury in understanding reactions with which it perhaps was not familiar. *Robinson,* 146 Wis. 2d at 335 (footnote omitted).

In the case at issue, of course, it was the State that attempted to capitalize on the misconceptions of the jurors concerning the effects of alcohol on sleep.

To say, as does the majority, that this evidence was not relevant is serious error. When the charge is having sexual contact with one who was asleep, it is difficult to imagine evidence that could be more relevant. I conclude that the error is constitutional in dimension. It denies

the defendant the right to present a defense under the due process clause of the 14th Amendment to the United States Constitution.

> 'The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.' *Taylor v. Illinois,* 484 U.S. 400, 409 (1988) (quoting *Washington v. Texas,* 388 U.S. 14, 19, (1967)).

I would reverse and remand for a new trial.

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN joins in this dissent.